## THE T. F. OAKES.

### ROBINSON et al. v. THE T. F. OAKES.

(District Court, S. D. New York. October 4, 1897.)

SEAMEN—SHORT ALLOWANCE—CHANGE OF ROUTE BY CAPE HORN—NEGLECT TO CALL—SCURVY—SHIP LIABLE—REV. ST. § 4568.

The ship T. F. Oakes, sailing from Hong Kong for New York by the way of Cape of Good Hope, was at first driven several hundred miles to the eastward by bad weather, whereupon the master changed his route by way of Cape Horn, from 5,000 to 7,000 miles further. The supplies were sufficient for the former route, but plainly insufficient for the latter. The master made no attempt to obtain additional supplies, as he might easily have done at Honolulu, Chili, or Rio Janeiro. Most of the crew suffered from scurvy through insufficient quantity and variety of food, and some died, apparently from that disorder. *Held*, seamen entitled to recover their damages arising from the master's neglect to procure additional supplies, and the consequent short allowance, including the compensation provided by section 4568 of the Revised Statutes.

In Admiralty.

Geo. C. Bodine and George Whitfield Betts, Jr., for libelants.
Turner, McClure & Ralston, for defendant.

BROWN, District Judge. The above libels were filed by various seamen on the ship T. F. Oakes, to recover damages for their sufferings from scurvy, on a voyage from Hong Kong to New York in 1895 to 1896, through lack of a sufficient quantity and variety of food. Upon a criminal prosecution of the master for the same cause under section 5347 of the United States Revised Statutes, in May, 1897, in which it was necessary, in order to make out a criminal offense, to show that the negligence was willful and malicious, the master was acquitted. Upon the hearing of the above libels the same evidence has been introduced, with additional testimony. The issue here does not necessarily involve willful, or malicious negligence; but only the question whether there was an actual neglect to supply proper and sufficient food, and neglect to use reasonable endeavors to do so. Upon this issue, a careful consideration of all the testimony satisfies me that the libelants are entitled to recover.

The ship sailed from Hong Kong on July 4, 1895. She was reasonably provisioned for a voyage to New York by way of the Cape of Good Hope, which was the route expected to be taken, and for which the ship was fitted out. This voyage is usually made in from 130 to 180 days, but it is liable to be further prolonged. The Oakes had a supply of salt beef for 189 days; pork for 168 days; flour for 210 days; peas for 182 days; with ship bread, rice, tea, coffee and sugar for a longer period. This was sufficient for a voyage around the Cape of Good Hope. The general charge of bad quality I do not find sustained.

The proper course for the Cape of Good Hope was southerly through the China Sea, thence westerly through the Straits of Sunda into the Indian Ocean. Shortly after leaving Hong Kong, however, the ship was driven by storms several hundred miles to the eastward, across the China Sea, and a succession of calms and baffling winds still continuing, the master on July 19th, in longitude 123 E., determined to follow the easterly route by the way of Cape Horn. In the log of that date is the entry: "15 miles from Ballingtang Island, I take a new departure into the North Pacific Ocean." This route to New York was from five to seven thousand miles further than the route by the way of the Cape of Good Hope. The sailing qualities of the Oakes were of a very moderate order, and she was liable to make slow passages, as her master well knew. In the last passage around the Horn, the ship was 150 days in making New York from a point in about 7 degrees south latitude, off the coast of South America, the same time as on this voyage, and on this voyage she was 110 days in reaching that point. In all she was 260 days out, though she stopped at no intermediate port. In the principal articles of food she had plainly but a short supply of provisions for the route by way of Cape Horn, measured according to the captain's last trip with the Oakes by that route, and it was the obvious duty of the master therefore on changing to the longer route, after delays during two weeks, to obtain additional supplies at the first opportunity at some of the large and convenient

ports which lay along the route.    There were several of these, such as Honolulu, Valparaiso and Rio Janeiro, where there would be no difficulty in obtaining the requisite additional food.

For this reason, although the circumstances in proof seem to me insufficient to show that the change to the longer route was likely to be a wise one, the log showing fair winds for a southerly course for several days from July 19th, I treat that question as being wholly within the master's judgment and discretion; but only because the needful additional supplies were easily obtainable.    Had there been no such ports, or had the master intended to make no effort to get more supplies at any of them, I should have regarded the change of route as wholly unjustifiable, and in fact a blind disregard of duty, and a reckless exposure of the ship and crew.    I cannot make out from the evidence just what the master really expected in this regard except to trust to luck and the chance of getting supplies from some vessels he might meet.    He went near the Sandwich Islands; but he made no attempt to call there, or at any other port until near the Bahamas, which, he says, he was also unable to reach, again through baffling winds.    This was many months after the crew had been put upon short allowance, and after some had died and most of the remainder were already suffering more or less from scurvy.

Upon a voyage from Hong Kong around the Horn, the master had no right to count on meeting vessels that could spare any such amount of additional supplies as he needed.    He met in fact but one vessel that could give him any, viz. the Gov. Robie, on January 13th, and that a small amount only, until March 15, 1896, five days from New York, when the ship was taken in tow by the steamer Kasbeck, the crew being greatly reduced by sickness, exhaustion and distress.    The voyage occupied, as I have said, 260 days; two of the crew, and perhaps a third, died from independent causes; three others died with symptoms indicating scurvy; and of the remaining sixteen men on board every one forward of the cabin had become ill; some incapable of any work, and others partially disabled.    The general symptoms were sore and bleeding gums, teeth loosened and falling out, limbs swollen and discolored, with weakness and exhaustion.    The physicians on shore, after the ship's arrival, had no hesitation in pronouncing the disorder to be scurvy; a disorder arising from one cause alone, viz. a lack of a sufficient quantity and variety of food.    The log in noting the death of Thomas King, on December 26th, mentions his claim that the disease was scurvy.    Others at that time made the same complaint. The provisions of the Revised Statutes are believed to be sufficient to make this disorder impossible, if they are observed; and scurvy, though formerly not uncommon on long voyages, is now rare in American vessels.

Complaints of a lack of sufficient food were made early on the voyage; three times before the end of September the crew went aft with their complaints.    Upon their demand, the government allowance was for a time served out to them, or said to be served out; it is impossible upon the evidence to say whether it was fully served out or not.    But the crew soon found themselves no better off than before;

and the majority after a few weeks voted to return to the master's "full and plenty," which they say was gradually diminished, resulting in renewed complaints. On October 24th, when 110 days out of Hong Kong and being then off the South American coast, in about 7 degrees south latitude, the master explained the short supply by saying, that from that point a previous voyage took 150 days, and that he must economize the food. The log makes no mention of this until December 11th, when it states that "the crew came aft complaining of the shortness of food" and were "half starved"; the log adds: "This is not so. * * * The ship through adverse chances has been a long time at sea with no means of replenishing her, and hence what remains on board is served out in such a manner as to economize for future contingencies."

No explanation is offered by the master of his failure to put into the Sandwich Islands or Valparaiso for necessary supplies, which he must have known would be needed. The voyage had been very slow up to each of these points; and he knew that the supplies could not hold out, except by many months of short allowance; and to this he had no right to subject the crew, when ports of relief were accessible. No case of negligence in this regard it seems to me could be more plainly made out.

It is a pleasure to state that Mrs. Reed, the master's wife, did, indeed, do all in her power to restore those who were ill, and to ameliorate their sufferings. But while she thus softened their hardships, and to some extent shared in the general distress, this in no way excuses the antecedent wrong and the neglect to obtain proper supplies. The ship must therefore make good to the seamen their actual pecuniary damages, taking account of the statutory allowance.

Upon all the circumstances and the evidence, I do not think the amount of the deficiency is clearly shown to have been more than one-third; so that the amount recoverable under section 4568 of the Revised Statutes will be 50 cents per day for each seaman during the time of the short allowance, which I reckon from October 1st to March 16th, upon the reasonable inference to be drawn from the testimony of the master as well as of the seamen. This was 166 days, and amounts to $83 to each seaman.

Four of the original libelants, namely, Sandstrom, Gustavsen, Fromhold, and Bemeison, have executed releases of all claims. No question on this point is made as respects the last two. As respects the two seamen first named, it is contended that the settlement made with them was unfair and should be disregarded. The testimony on that point is, however, extremely full and circumstantial, showing that they were fully acquainted with the facts, understood that a claim had been made in their behalf against the ship, that they desired to make a full settlement, and accepted the moneys offered to them, and that they executed releases fully understanding that they were in discharge of all claims against the ship. This was also done at the office of the shipping commissioner. A settlement so fully understood at the time should not, I think, be set aside.

The remaining eight seamen are entitled to some additional compensation for the sickness, suffering and disability reasonably attribut-

able to the lack of proper food. It is by no means easy, however, to form any certain judgment upon this point from the probable fact that other circumstances and causes contributed to the illness or disability of some of the men, and it is impossible to separate fully these contributing causes. From the presence, however, of certain common symptoms in all these men occurring only during the latter part of the voyage, between Christmas and the arrival of the ship in March, there seems to be no reasonable doubt that there was sickness arising from scurvy, caused by the lack of proper food. All had soreness of the gums and looseness of the teeth. Hautel lost four teeth, Fraser two teeth, Weber two teeth and Peterson five teeth. All had swelling of the limbs with discoloration, and all were laid up in their bunks for different periods from two to five weeks, and all went to the hospital and were treated on their arrival. Dr. Baker, who examined each of them, states that in June last the symptoms of scurvy were still apparent and that the disabilities suffered would be to some extent permanent.

Upon as careful consideration as I am able to give to the circumstances testified to in relation to each, I award, besides the sum above mentioned, to Hautel, Fraser, Peterson and Larsen $300 each; to Weber and Arro $275 each; to Robinson and Anderson $250 each; in all $2,914.

A decree may be entered accordingly, with costs.